UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

IA TONDA PHUPA TRIK TAYLOR,

                Plaintiff,                    Case No. 2:20-cv-174

v.                                    Honorable Robert J. Jonker

HEIDI WASHINGTON et al.,

                Defendants.
_____/

## OPINION

        This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983, as well as, purportedly, 42 U.S.C. §§ 1981, 1985, and 1986, the Health Insurance Portability and Accountability Act (HIPAA) Pub. L. 104-191, 110 Stat. 1936 (1996), and various provisions of state law.  Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.  28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c).  The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.  The Court will also deny Plaintiff's pending motions.

## Discussion

I.     **Factual allegations**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Kinross Correctional Facility (KCF) in Kincheloe, Chippewa County, Michigan. The events about which he complains occurred at that facility.

Plaintiff sues the following MDOC employees:  Director Heidi Washington; Deputy Director At-Large Kenneth McKee; Director of Health Care Services Marti Kay Sherry; and Deputy Director/Chief Grievance Coordinator Richard Russell.  Plaintiff further sues the following KCF employees:  Warden Michael Brown and Grievance Coordinator Melissa Gustafson.  Plaintiff also sues Corizon Healthcare, Inc. (Corizon) and its CEO Kathy Witty; NXGEN MDX (NXGEN), NXGEN Physician Timothy Stallman, and NXGEN "Proof Signature" Jacqueline Peacock;[1] Keefe, Inc.; and Access Securepak (Access).

Although the body of Plaintiff's typewritten complaint spans 66 pages—142 pages with the attachments—it contains relatively few factual allegations that could give rise to a claim under § 1983 or any other law.  As with dozens of other prisoners who have brought cases in the Western District of Michigan during the last year, Plaintiff appears to have a legitimate fear of the threat posed by the ongoing COVID-19 pandemic.  He seeks to challenge the response of the MDOC and several of its contractors.  Yet, rather than describing in simple and clear terms the conduct of which he complains, Plaintiff states numerous legal conclusions—based apparently on speculation—and cites many constitutional provisions, statutes, regulations, and cases of marginal

---

[1] Plaintiff refers to Defendant Peacock "as the Proof Signature" at NXGEN.  (Compl., ECF No. 1, PageID.20.) Presumably, Plaintiff refers not to a title but to the fact that Defendant Peacock signed his COVID-19 test results. (*See id.*, PageID.113.)

relevance.   Moreover, where Plaintiff provides factual allegations, his chronology of events frequently is muddled and unclear.

Plaintiff alleges that he suffers or has suffered from multiple medical maladies while in the custody of the MDOC.  In 2003, Plaintiff was diagnosed with chronic heart disease, chronic hypertension, and an irregular heartbeat.  (Compl., ECF No. 1, PageID.22.)  Plaintiff also has several psychiatric conditions.   He has been diagnosed with "severe depression/schizo-affective disorder," bipolar disorder, psychotic mood disorder, and an anxiety disorder.  (*Id.*, PageID.26.)  Plaintiff further alleges that in October 2018 while at the Ionia Correctional Facility, he contracted a severe case of influenza during an outbreak at the facility.  (*Id.*, PageID.24.)

Plaintiff receives multiple treatments for his medical conditions. Plaintiff was placed in a chronic care treatment program.  He states that the program only treats his medical conditions but not his psychiatric conditions.  Plaintiff asserts that under the treatment program, he takes Lisinopril, Hydrochlorothiazide, and Simvastatin.  For his psychiatric conditions, he takes medications including Trilifon, Celexa, and what he refers to simply as "cocktails."  Plaintiff also states that he must avoid excessive heat.

Plaintiff's more recent allegations begin in January 2020.  On January 12, 2020, he alleges that KCF administration locked the facility down due to a virus outbreak.  Plaintiff speculates that this outbreak was, in fact, due to the virus that causes COVID-19.  Plaintiff, like other prisoners at KCF, lives in a double-bunked cube that is approximately 12 feet by 20 feet, which he shares with seven other prisoners.  During the January 2020 outbreak, several prisoners were seen by Corizon personnel or other health care staff and then returned to Plaintiff's cube. Plaintiff alleges that when he came down with symptoms soon afterward, he was provided with Tamiflu.  Medical personnel did not provide him a mask in January 2020.  Plaintiff alleges that

providing Tamiflu in January 2020 was a "cruel cost-cutting . . . method[] [that] is extremely dangerous and should not be a medical remedy 'during COVID-19', which will result 'in serious risk' of injury." (*Id.*, PageID.28.)

Plaintiff further alleges multiple deficiencies related to masks beyond the failure of medical personnel to provide him one in January 2020.  Plaintiff asserts that "the CDC issued the DEFENDANT[]S very strict 'Personal Protection Equipment and Guidelines' (PPE-GL), specifically for PLAINTIFF as a 'prisoner', to first be provided" with either a "3M VFlex 1085S Mask" or an "N95 Mask." (*Id.*)  On April 7, 2020, several Defendants provided him with what he describes as a "dangerously inefficient, extremely thick an[d] unbreathable 'Washable Mask[s].'" (*Id.*)  Plaintiff contends that in providing these masks, Defendants engaged in "deliberate avoidance of federal mandates" because they did not provide the masks he purports the CDC required nor were the mask Defendants did provide vetted or approved "by the CDC, NIH, WHO, or any State or Federal Health agency." (*Id.*)  Plaintiff further argues that the MDOC Defendants conspired with Defendants Corizon and Witty when they did not provide N95 masks after federal officials "'made available 500 million N95 masks' to the States." (*Id.*)  In short, Plaintiff alleges that because he has not been provided with N95 or similar masks, Defendants have been deliberately indifferent to his health and wellbeing.  Masks, however, are just one facet of MDOC's COVID-19 response that Plaintiff finds lacking.

Plaintiff also takes issue with the selection of soap available to prisoners.  He acknowledges that Defendants Washington, McKee, and Sherry provide MDOC prisoners four bars of soap every two weeks, and he attaches a diagram showing their size.  He alleges that the CDC "mandated that PLAINTIFF be provided with as much 'alcohol-based antibacterial soap as needed,'" and that "the scientific findings that alcohol-based antibacterial soap contains a 'high

percentage' of a 'key bacteria and germ killing' ingredient: 'Benzalkonium Chloride.'" (*Id.*, PageID.32–33.)  Plaintiff asserts, however, that the MDOC soap "do[es] not contain the mandatory[] 'Benzalkonium Chloride' anti-bacteria killing ingredient." (*Id.*, PageID.34.)  Plaintiff maintains that because the MDOC soap does not contain what he views as a necessary ingredient, he is forced to purchase expensive soaps from Defendants Keefe and Access.  He claims that even the options available for purchase, however, have extremely low levels of benzalkonium chloride. Plaintiff contends that Defendants Keefe, Access, Washington, McKee, Sherry, Russell, and Brown refuse to comply with CDC guidelines.

Plaintiff further challenges various aspects of the MDOC's COVID-19 testing program.  He acknowledges that MDOC began testing prisoners in late March 2020, and he asserts that he was tested in early May 2020.  He allegedly received a "nasal swab test" which he argues has been found "attractively 'inexpensive' but dangerously 'inaccurate', and 'deadly.'" (*Id.*, PageID.36.)  In support of his position, he further alleges that the tests had "not cleared or [been] approved by the FDA." (*Id.*, PageID.38.)  He appears to allege that, due to what he deems as an inferior test, he received a false-negative result.  He also contends that, given the aggregate test results, several of the MDOC Defendants were irresponsible because one of the 1,541 prisoners at KCF had tested positive for COVID-19.

Although Plaintiff challenges the sufficiency of the COVID-19 testing both for himself and within his prison more broadly, he also challenges the authority of the MDOC to test prisoners in its facilities.  Plaintiff asserts that he "never provided sworn signature approval" to be tested.  (*Id.*)  Plaintiff argues that prisoners were placed in a position of choosing between permitting testing and quarantining for two weeks in segregation.  He also appears to allege that

his DNA was tampered with, and his "highly valuable 'DNA information'" was effectively "sold" as part of the testing process.  (*Id.*)

Plaintiff's remaining allegations are less connected specifically to the threat posed by COVID-19.  He asserts that the prison misused Medicaid funding allocated for him apparently provided under the federal government's emergency stimulus packages.  Prison officials allegedly listen in and interfere on phone calls when anything related to COVID-19 is discussed.  Prison officials also allegedly delayed or tampered with Plaintiff's mail, including some legal mail.  He alleges that one of the two Innocence Clinics working with him to challenge his conviction is no longer assisting him due to, at least in part, issues with mail.

Plaintiff subsequently alleges 17 separate "Counts"[2] apparently based on his allegations, which cite specific constitutional provisions, statues, and regulations. (*Id.*, PageID.47–64.)  Prior to referencing those specific authorities within each count, Plaintiff subtitles each count as "Violations of the United States Constitution," citing to the "First, Fifth, Eighth, and Fourteenth Amendments" as well as to "42 U.S.C. § 1983; §1981(a)–(c); § 1985(2), (3); § 1986."  However, Counts IV to XIII do not reference any federal law beyond HIPAA and criminal statutes found within Title 18.[3]  Counts I to III either explicitly or implicitly refer to the

---

[2] Plaintiff's final count is Count XVI, but there are two counts titled Count IX.  (*See* Compl., ECF No. 1, PageID.57.) Thus, there are 17 counts in total.  For the purposes of this opinion, the distinction between the two Count IXs is of no consequence and the Court will not further refer to either count titled as Count IX.  Thus, the Court will refer to the 17 counts as they are titled.

[3] On several occasions, Plaintiff alleges that Defendants also "severely violated Him . . . under Art. I, § 2[], and § 17[], as made applicable, by law, through Amendment XIV." (*See, e.g.*, Compl., ECF No. 1, PageID.56.)  Given the specific language of the article being made applicable by the Fourteenth Amendment, a reader would understandably expect that Plaintiff seeks to invoke Article I of the U.S. Constitution.  However, Article I, Section 2 of the U.S. Constitution describes the election and composition of the U.S. House of Representatives. That section hardly seems applicable here.  Moreover, Article I consists of only 10 sections, thus Section 17 does not exist in that article of the U.S. Constitution.

Clearly, Plaintiff intends to reference the Michigan Constitution.  The cited sections within the Michigan Constitution refer to equal protection and due process.  Those appear abundantly more relevant to his allegations.  Of course, the Michigan Constitution does not require the Fourteenth Amendment to be made applicable to the State.

Eight Amendment.  Count XIV cites to the First Amendment and Fourteenth Amendments because Defendants Washington, McKee, Russell, and Gustafson "deliberately denied PLAINTIFF'S grievances/complaints against policy norms under PD 03.02.130 . . . ."  (Compl., ECF No. 1, PageID.60.)  Count XV cites to 42 U.S.C. §§ 1985 and 1986, among other laws, and alleges that all Defendants "conspir[ed] against Plaintiff by and through primary negligence *per se* . . . ." (*Id.*, PageID.61.)  Finally, Count XVI cites to § 1985 and to substantive due process protections. (*Id.*, PageID.62.)

Plaintiff also appears to allege retaliation, stating, that "[h]ad it not been for PLAINTIFF engag[ing] in 'protected conduct' while under the DEFENDANT[S'] responsibility and care, He would not have injuries . . . ."  (*Id.*, PageID.46.)  However, the Complaint identifies neither the specific protected conduct he references nor any conduct that resulted.

For relief, Plaintiff states that he seeks "an amount which is fair, just, and reasonable and in excess of Twenty[-]Seven Million ($27,000,000.00) dollars, together with interest, and presumed damages, and any fees and costs . . . [and] declaratory [and] injunctive relief."  (*Id.*, PageID.66.)

II.    **Failure to state a claim**

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

III.   **HIPAA**

Plaintiff asserts numerous claims against Defendants that he alleges violate HIPAA.  On these claims, his complaint falls short.  There is no private cause of action for a HIPAA violation.  *Burley v. Rider*, No. 1:17-cv-88, 2018 WL 6033531, at *5 (W.D. Mich. Aug. 27, 2018), *R. & R. adopted* 2018 WL 4443071 (W.D. Mich. Sept. 18, 2018); *see also Faber v. Ciox Health*, *LLC*, 944 F. 3d 593, 596 (6th Cir. 2019) ("HIPAA doesn't authorize a private cause of action.").  Plaintiff, therefore, fails to state any claim under HIPAA.

IV.    **§§ 1981 and 1985**

Plaintiff also alleges that he brings claims under 42 U.S.C. §§ 1981 and 1985(3).[4]

Claims brought under §§ 1981 and 1985(3) require that a plaintiff allege that he is a member of a

protected class.  *See Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 867–68 (6th Cir. 2001)

("Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts

with both public and private actors"); *Bartell v. Lohiser*, 215 F.3d 550, 560 (6th Cir. 2000)

("[Section] 1985(3) only covers conspiracies against: 1) classes who receive heightened protection

under the Equal Protection Clause; and 2) 'those individuals who join together as a class for the

purpose of asserting certain fundamental rights'") (quoting *Browder v. Tipton*, 630 F.2d 1149,

1150 (6th Cir. 1980)).  Plaintiff does not allege that he is a member of a protected class.  Construing

the complaint liberally, Plaintiff presumably alleges that he is a "class of one" because he "has

been intentionally treated differently from others similarly situated and that there is no rational

basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

However, the Sixth Circuit has refused to permit §§ 1981 and 1985(3) "class of one" claims.  *See*

*Underfer v. Univ. of Toledo*, 36 F. App'x 831, 834 (6th Cir. 2002).  Thus, Plaintiff fails to state a

claim under either §§ 1981 or 1985(3).

V.    **§ 1986**

Plaintiff's claim under § 1986 fails for the same reason as his § 1985 claim.  Section

1986 provides as follows:

---

[4] Subsections (1) and (2) of § 1985 do not apply.  Subsection (1) is inapplicable because Plaintiff does not allege a
conspiracy to interfere with federal officers in the performance of their duties.  *See* 42 U.S.C. § 1985(1).  The first
clause of subsection (2) is also inapplicable because Plaintiff does not allege that Defendants conspired to influence
parties, witnesses, or jurors in federal court proceedings.  *See* 42 U.S.C. § 1985(2).  In addition, the second clause of
subsection (2) is inapplicable because Plaintiff does not allege that Defendants conspired to "interfere with due process
in state courts with the intent to deprive persons of their equal protection rights."  *Fox v. Mich. State Police Dep't*,
173 F. App'x 372, 376 (6th Cir. 2006).

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured . . . for all damages caused by such wrongful act, which such person with reasonable diligence could have prevented . . . .

42 U.S.C. § 1986.  The cause of action under § 1986, by its terms, is premised on the violation of § 1985.  Because Plaintiff fails to state a claim under § 1985, his claim under § 1986 fails as well.  *See Bartell*, 215 F.3d at 560 (explaining that § 1986 is derivative and conditioned on establishing a § 1985 violation); *Browder*, 630 F.2d at 1154 (same).

## VI.    **First Amendment**

Construing the complaint with all due liberality, Plaintiff has alleged that Defendants violated his First Amendment rights by retaliating against him, rejecting his grievances, and denying him access to the courts.

### A.    **Retaliation**

Reading Plaintiff's complaint indulgently, *see Haines*, 404 U.S. at 520, he has alleged a claim of retaliation in violation of the First Amendment.  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, in least in part, by the protected conduct.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  Moreover, Plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)); *see also Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial") (internal quotations omitted); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("[B]are allegations of malice on the defendants' parts are not enough to establish retaliation claims" that will survive § 1915A screening) (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998)). Plaintiff merely alleges the ultimate fact of retaliation in this action. He has not presented any facts to support his conclusion that Defendants retaliated against him. Accordingly, his speculative allegation fails to state a claim.

### B.    Grievances

Plaintiff's right to petition government is not violated by Defendants' rejection nor the failure to process or act on his grievances. The First Amendment "right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999).

Moreover, Defendants' actions have not barred Plaintiff from seeking a remedy for his grievances. *See Cruz v. Beto*, 405 U.S. 319, 321 (1972). "A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only 'one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials' while

leaving a formal grievance procedure intact." *Griffin v. Berghuis*, 563 F. App'x 411, 415–16 (6th Cir. 2014) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n.6 (1977)). Indeed, Plaintiff's ability to seek redress is underscored by his pro se invocation of the judicial process. *See Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982).  Even if Plaintiff had been improperly prevented from filing a grievance, his right of access to the courts to petition for redress of his grievances (i.e., by filing a lawsuit) cannot be compromised by his inability to file institutional grievances, and he therefore cannot demonstrate the actual injury required for an access-to-the-courts claim. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 355 (1996) (requiring actual injury); *Bounds v. Smith*, 430 U.S. 817, 821–24 (1977).  The exhaustion requirement only mandates exhaustion of *available* administrative remedies. *See* 42 U.S.C. § 1997e(a).  If Plaintiff were improperly denied access to the grievance process, the process would be rendered unavailable, and exhaustion would not be a prerequisite for initiation of a civil rights action. *See Ross v. Blake*, 136 S. Ct. 1850, 1858–59 (2016) (reiterating that, if the prisoner is barred from pursuing a remedy by policy or by the interference of officials, the grievance process is not available, and exhaustion is not required); *Kennedy v. Tallio,* 20 F. App'x 469, 470–71 (6th Cir. 2001).  In light of the foregoing, the Court finds that Plaintiff's allegations related to grievances fail to state a claim.

###    C.    Access to the Courts

Plaintiff has vaguely alleged that his legal mail may have been tampered with or delayed.  It is well established that prisoners have a constitutional right of access to the courts. *Bounds*, 430 U.S. at 821. The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Id.* at 817.  The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft

legal documents with notarial services to authenticate them, and with stamps to mail them." *Id.* at 824–25.  The right of access to the courts also prohibits prison officials from erecting barriers that may impede the inmate's access to the courts.  *See Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992).

An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit.  In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury."  *Lewis*, 518 U.S. at 349; *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000.  In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351–53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996).  The Supreme Court has strictly limited the types of cases for which there may be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.  The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355.  "Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus-X*, 175 F.3d at 391.  Moreover, the underlying action must have asserted a non-frivolous claim.  *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (*Lewis* changed actual injury to include requirement that action be non-frivolous).

In addition, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415

13

(2002) (citing *Lewis*, 518 U.S. at 353 & n.3).  "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant."  *Id.* at 416.  Plaintiff has not alleged that he has suffered any harm beyond his suggestion that issues with mail may have contributed to one Innocence Clinic's decision to cease working with him.  This falls far short of "actual injury" described by *Lewis* and *Thaddeus-X*.  Accordingly, his speculative allegation fails to state a claim.

VII.    **Eighth Amendment**

Likewise, Plaintiff's allegations do not rise to the level of an Eighth Amendment violation.  The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency."  *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain."  *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."  *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety."  *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate

14

indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims).

In a recent case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the objective component of an Eighth Amendment claim:

> In assessing the objective prong, we ask whether petitioners have provided evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health risks posed by COIVD-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

The Sixth Circuit went on to address the subjective prong of an Eighth Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison.

> There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.

The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844.  The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible."  CA6 R. 35, Appellant Br., PageID 42.  These actions include

> implement[ing] measures to screen inmates  for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.

*Id.* at 42–43.

The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment.  We agree.

Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights.  *Farmer*, 511 U.S. at 844.  The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton.  Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks.  The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing.  The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Id.* at 840–41.

In its decision, the Sixth Circuit recognized that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel, such as cleaning cells, quarantining infected inmates, and distributing information about a disease in an effort to prevent spread, to be reasonable.  *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v.*

*Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018). The *Wilson* Court also noted that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk posed by COVID-19:

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d [1081,] 1085 [(11th Cir. 2020) (per curiam)]. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously." *Id.* at 1088–90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.
>
> Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier*, 956 F.3d 797 (5th Cir. 2020) (per curiam),] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802–03. In *Marlow*e, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at *2–3.

*Wilson*, 961 F.3d at 841–42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions to not only treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In addition, in *Cameron v. Bouchard,* 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims. The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19 at the jail. The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all [j]ail inmates with access to certain protective measures and medical care intended to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days." *Id.* at 394. However, following the decision in *Wilson*, the Court granted the defendants' renewed emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs. *Id.* at 395. Subsequently, in an unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction. *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

In the instant case, Plaintiff claims that Defendants' handling of the COVID-19 crisis violated his Eighth Amendment rights while he was confined at KCF. The Court notes that

the MDOC has taken significant measures to limit the threat posed by COVID-19.[5]  *See* MDOC, *MDOC Response and Information on coronavirus (COVID-19)*, https://medium.com/@Michigan DOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337   (last   visited Mar. 8, 2021).[6]  These measures include:

### Information on COVID-19 Vaccinations

Staff COVID-19 Vaccinations began in later Dec. 2020 and employees across the department have now received vaccinations with the help of local county health departments and the Michigan National Guard.

In accordance with MDHHS vaccination strategy, prisoners 65 years and older have previously been offered the vaccine.  Starting on Monday, March 8, facilities will begin offering the vaccine to prisoners who are aged 50 and older with an underlying health condition.

### Personal Protective Equipment, cleaning and mitigation measures

- Michigan State Industries has produced masks for all prisoners and correctional facility staff to wear.  Each employee and prisoner received three masks each and the masks can be laundered and worn again. Facility staff are also permitted to bring their own PPE, such as masks, gloves and gowns.  Staff are expected to wear their mask during their entire shift and prisoners are expected to also wear their masks at all times, except while eating, sleeping or showering.  Michigan State Industries also manufactured gowns, protective eyewear and protective suits.  Every facility was expected to receive a new order of MSI masks for both prisoners and staff as of late July.  These are made of a lightweight material for use during the summer months.  Prisoners will receive three each and staff will receive three each as well.  FOA and Central Office staff will be receiving new masks as well.

---

[5] The Court takes judicial notice of these facts under Rule 201 of the Federal Rules of Evidence.  The accuracy of the source regarding this specific information "cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see also* Paul F. Rothstein, *Federal Rules of Evidence* 49 (3d ed. 2019) (citing *Matthews v. NFL Mgmt. Council*, 688 F.3d 1107 (9th Cir. 2012) (taking judicial notice of statistics on the NFL website that the plaintiff played 13 games in California over 19 years); *Victaulic Co. v. Tieman*, 499 F.3d 227, 236–37 (3d. Cir. 2007), as amended (Nov. 20, 2007) (finding error where a district court took judicial notice of facts stated in "a party's . . . marketing material" on an "unauthenticated" website because marketing materials often lack precise and candid information and the source was not authenticated)).  Moreover, "[t]he court may take judicial notice at *any* stage of the proceeding."  Fed. R. Evid. 201(d) (emphasis added).  Thus, the Court may take judicial notice even at this early juncture because the Court is permitted to take judicial notice *sua sponte*, Fed. R. Evid. 201(c)(1), and "the fact is not subject to reasonable dispute," Fed. R. Evid. 201(b).

[6] Although the page is hosted on Medium.com, the MDOC specifically links to this page from their website as the location where they will provide updates and information.  *See* https://www.michigan.gov/corrections/0,4551,7-119-9741_12798-521973--,00.html (last visited Mar. 8, 2021).

- All MDOC staff transporting a prisoner on or off grounds are required to be dressed in full personal protective equipment (PPE), which is available for those employees.

- All facilities have received approval from the regional sanitation officer to use bleach during facility cleaning. Facilities have enhanced cleaning efforts and cleaning products are available to clean commonly-used areas and phones before and after use. Cleaning efforts have been doubled at facilities with vulnerable prisoner populations. We have increased our production of soap and ensured that all prisoner areas and bathrooms have plentiful access to soap. Soap has been distributed to prisoners and prisoners have been told that if they need more soap they only need to ask. Additional soap will be provided at no charge. CDC posters detailing proper hygiene practices have been posted in correctional facilities and have also been recreated digitally so they play on TV screens throughout our facilities. These are the same posters you will see in your community and throughout State of Michigan office buildings.

- Movements have been modified to help facilitate social distancing and the number of prisoners attending classes and meals has been reduced so prisoners can be seated farther apart. Prisoners and staff are frequently reminded of the need for social distancing and prisoners are instructed not to gather in groups on the yard. Activities such as basketball and weight pit have been suspended to encourage social distancing, as well. There are also markers and cones set up for med lines and in the chow hall as a visual reference for prisoners on how far apart they should stand.

- The department has been leading the nation when it comes to consistent testing of the prisoner population. Following the completion Friday, May 22, of testing prisoners at Michigan Reformatory in Ionia for COVID-19, the Michigan Department of Corrections has completed its goal of testing every prisoner in its system. Testing also continues daily at our facilities. When prisoners are set to parole, discharge or other such movements, they are tested again and are not moved until the test results return.

- Staff and visitors can also access information about their facility by signing up for Nixle alerts. To sign up for Nixle alerts, go to www.michigan.gov/corrections and select the page for the correctional facility in your area to register via the Nixle Widget, or text the zip code of the facility you would like to receive updates from to 888777.

**Visits and Transfers**

- Visitation at facilities statewide was suspended as of March 13[, 2020].

- After suspending visitation at all correctional facilities to protect the health of staff, prisoners, and the public, Director Heidi Washington convened a Visiting Operations Committee to develop recommendations for reactivating prisoner visits. The committee recommended establishing a

pilot project to evaluate the use of video visitation technology and online scheduling of prisoner visits.  The following MDOC Facilities will serve as pilot sites for video visitation: Women's Huron Valley Correctional Facility (WHV); G. Robert Cotton Correctional Facility (JCF); Chippewa Correctional Facility (URF); Richard A. Handlon Correctional Facility (MTU); Ionia Correctional Facility (ICF); Parnall Correctional Facility (SMT); Duane Waters Health Center (DWH).  More information is located in the visitations section of this page below.

- During this time when visits are suspended, we have worked with GTL and JPay to provide enhanced services for you to communicate with your family and friends.  Detailed information from those companies is being relayed to the prisoner population.  JPay is continuing to offer two free stamps per week through April 30, 2021.  GTL's internet and mobile fees are reduced with the regular $2.95 transaction fee reduced to $1.95 and the $1.95 transaction fee reduced to $0.95.

- In connection with visitation suspension, face-to-face college classes at all facilities have also been suspended effective immediately.  The MDOC will work with higher education institutions willing and able to deliver classes as correspondence courses.  Core programming and school classes taught by MDOC staff will continue.

- Outside contractors for substance abuse programming will be allowed inside and will be screened upon entry per the screening protocol.  Attorney visits will continue to be authorized.

- During this time, transfers of prisoners or staff between facilities will not be authorized without the approval of the Assistant Deputy Director or higher.

- The department issued protocol to all county sheriff offices to offer guidance on screening and other preventative measures.

**Quarantine and Care of Sick Prisoners**

- Facility healthcare staff will meet with prisoners who have presented with symptoms of coronavirus.  The MDOC does not make the diagnosis of the coronavirus.  The department is following the Michigan Department of Health and Human Services protocol.

- Prisoners who test positive for the virus are isolated from the general population and any prisoners or staff they have had close contact with are identified and notified of the need to quarantine.

- Prisoners who test positive may be transferred to the department's designated quarantine unit at Carson City Correctional Facility.  This unit is completely separated from the main facility, has limited movement and access to the unit is limited.  Only a small number of designated staff work in the unit in 12-hour shifts to limit the number of people entering.  Those staff members report directly to the unit and do not enter the main

correctional facility. Prisoners transferred to the unit also stay on the unit and do not enter any other areas of the prison.

- Prisoners who have been identified as having close contact with another prisoner who tests positive, but have not tested positive for the virus themselves, will be isolated from the general population at their facility for the 14-day quarantine period.

- Co-pays for prisoners who need to be tested for COVID-19 have been waived.

- Prisoners have been urged to notify healthcare if they are sick or experiencing symptoms of illness so they can be evaluated. Prisoners who require outside medical attention will be transported to an area hospital for treatment.

- Prisoners are considered in step-down status when they no longer have symptoms, are no longer considered contagious and have been medically cleared by our chief medical officer.

**Parole Information**

- The MDOC Parole Board continues to hold parole hearings and is reviewing all eligible cases to determine prisoners who can be safely released at this time. In addition, the department is holding remote public Parole Board hearings for parolable life sentence and clemency cases. You can find more information on scheduled hearings and how to participate here.

- The department continues to review individual cases and the Parole Release Unit is working to process parole releases for prisoners with positive parole decisions as quickly and safely as possible.

- We are no longer allowing parole representatives to enter correctional facilities for parole hearings as an additional step to limit the potential introduction of illness. However, individuals designated by a prisoner as [] parole representatives should contact the facility where the prisoner is being housed to find out about options to call in for the hearing.

- The Parole Board is aware that prisoners do not have access to certain programming and the Board is taking that into consideration. If there are changes in the prisoner's case, the prisoner will be notified directly.

- We continue to monitor the prisoner population, our parole and probation population and the parole process as this pandemic continues, in order to consider all options to ensure the safety of offenders under our supervision.

- All of our paroles are done with public safety in mind. The Parole Board looks at each individual on a case-by-case basis and will only grant a parole if they believe that person will not be a harm to society.

- All prisoners set to parole must take a COVID-19 test before being released. The MDOC is working to expedite the parole release of those individuals

who can safely and legally be released at this time.  There are a number of steps that are included in the parole release process, which now includes testing for COVID-19 to ensure the individual will not pose a risk to loved ones or the community upon release.  As a result, a limited number of parole dates may be changed to accommodate these processes.  If a prisoner tests positive they will not parole until they are cleared by healthcare, which is at least 14 days from the onset of symptoms.  Prisoners who test negative will be paroled as scheduled.

**Staff Measures and Information**

- The need for social distancing to help prevent the spread of this virus has included asking organizations to have as many people telecommute as possible, and the MDOC is doing that to the extent we can.  Employees should have been authorized to telecommute by their supervisor and supervisors who have questions should contact their leadership.   No employees who have been ordered to telecommute should return to their work site unless authorized to do so by their deputy director or Director Washington.  Employees who are telecommuting should complete required online training during this time.

- ALL correctional facility employees continue to report to work.  Our facilities need to continue operating as close to normal as possible for the safety of those both outside and inside the institution.  We need to continue to keep those incarcerated engaged and occupied in a productive manner to ensure the stability, safety and security of our facilities.  Thank you to our correctional facility staff for all they do to keep the citizens of our state safe.

- Anyone entering facilities will be subject to enhanced screening prior to entering.  This includes answering screening questions and having their temperatures taken.  Anyone suspected of having symptoms will not be allowed in the facility.

- The Michigan Correctional Officers' Training Council has supported the Department's request to extend the period for obtaining necessary college credits to 24 months from date of hire.  Officers who are deficient in their college credits will now have 24 months from their date of hire to complete the required college credits, rather than 18.  This change allows officers extra time during this period of uncertainty.

- As the state works to limit the spread of the virus, we caution employees not to let fear lead to discriminatory actions against any individuals based on their disability, race or ethnicity.  If you have experienced or witnessed discriminatory harassment or discrimination, we want you to know it will not be tolerated and we strongly encourage you to report it by calling the MDOC Equal Employment Opportunity Office at 1–800–326–4537, 517–335–3654, or by contacting MDOC EEO Officer Toya Williams at 517–335–4125 or williamst8@michigan.gov.

- The department's corrections officer training academies will now be starting again with social distancing measures and enhanced cleaning and sanitizing efforts in place.

- The Department of Health and Human Services issued an emergency public health order on Aug. 19 requiring COVID-19 testing of all staff at any facilities that have a positive staff or prisoner case. Employees must continue to obtain testing weekly until 14 days after the last confirmed positive case at the facility. Employees can receive testing in the community or utilize the free, on-site testing the MDOC will provide each week the order applies at a facility.

- The Department of Health and Human Services issued an emergency public health order on Feb. 10 requiring daily testing of all employees and prisoners at a facility where an outbreak of special concern has been declared for at least 14 days.

**Operational Changes**

- Corrections Transportation Officers or other department staff will be reassigned to facilities to augment custody staff as determined by Assistant Deputy Directors.

- No out-of-state business travel will be allowed until further notice. All in-state business travel should be for essential matters only and precautions, including wearing a mask, should be used if traveling with others in the same vehicle.

- Most construction projects have been placed on hold. Each project will be evaluated on a case-by-case basis.

- Staff are encouraged to use phone calls, email and teleconferencing in place of in-person meetings when possible. Any necessary in-person meetings should be limited as much as possible and the size of the meeting should be reduced to allow for attendees to stay the recommended 6-foot distance apart.

*Id.* Further, the MDOC issued a COVID-19 Director's Office Memorandum (DOM) on April 8, 2020, and issued multiple revised DOMs on the subject. *See* MDOC DOM 2020-30R2 (eff. May 26, 2020) (outlining specific precautions to be taken by staff members, including the use of personal protective equipment and hand sanitizer); MDOC DOM 2020-30R3 (eff. May 27, 2020); MDOC DOM 2020-30R4 (eff. Aug. 10, 2020); MDOC DOM 2020-30R5 (eff. Aug. 25, 2020); MDOC DOM 2020-30R6 (eff. Aug. 27, 2020); MDOC DOM 2020-30R7 (eff. Nov. 5, 2020); MDOC DOM 2020-30R8 (eff. Nov. 24, 2020); MDOC DOM 2021-26 (eff. Jan. 1, 2021); MDOC

DOM 2021-26R (eff. Jan. 12, 2021); MDOC DOM 2021-26R (eff. Jan. 12, 2021); MDOC 2021-26R2 (eff. Jan. 21, 2021); MDOC DOM 2021-26R3 (eff. Jan. 25, 2021); MDOC DOM 2021-26R4 (eff. Mar. 5, 2021).  The DOMs set forth specific details about protective measures to be taken in all facilities:  describing the types of PPE to be worn by staff and when; setting screening criteria for individuals entering facilities; setting social distancing requirements; establishing isolation areas and practices for isolation; setting practices for managing prisoners under investigation for COVID-19; modifying how personal property is managed; setting requirements for jail transfers; outlining communication adjustments and video visitation; upgrading hygiene, health care, and food service policies, setting protocols for COVID-19 testing of prisoners; and making other necessary adjustments to practices to manage the pandemic.  Thus, the MDOC recognized the need to adjust practices and implemented those practices by way of policy.

Clearly, the MDOC has taken extensive steps to address the risk of COVID-19 to inmates statewide.  As noted by the Sixth Circuit in *Wilson*, such actions demonstrate the opposite of a disregard of a serious health risk.  *Wilson*, 961 F.3d at 841.  Therefore, Plaintiff cannot demonstrate that Defendants were deliberately indifferent to his medical needs.

Moreover, Plaintiff's assertions that Defendants must provide him N95-type masks or soap containing specific ingredients appear misplaced.  Perhaps Plaintiff labors under the false impression that outside the gates of KCF, the general public has access to, and often uses, N95 masks.  That is not the case.  Such masks remain scarce, even for healthcare workers.  Indeed, the CDC explicitly directs that people "DO NOT choose masks that . . . [a]re intended for healthcare workers, including N95 respirators."  CDC, *Your Guide to Masks*, https://www.cdc.gov/ coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html (last visited Mar. 8,

2021).[7]   Instead, the CDC recommends washable cloth masks with two or more layers.  *Id.*  Additionally, the CDC advises using plain soap, not "antibacterial" soap, when washing hands.  *See* CDC, *Show Me the Science – How to Wash Your Hands*, https://www.cdc.gov/handwashing/show-me-the-science-handwashing.html (last visited Mar. 8, 2021).   The CDC advises that "studies have shown that there is no added health benefit for consumers (this does not include professionals in the healthcare setting) using soaps containing antibacterial ingredients compared with using plain soap."  *Id.*  The CDC further advises that washing hands with soap is favored over using alcohol-based hand sanitizers.   *See* CDC, *When and How to Wash Your Hands*, https://www.cdc.gov/handwashing/when-how-handwashing.html (last visited Mar. 8, 2021).  The CDC recommends cloth masks and plain soap, and Plaintiff alleges that these are what Defendants have provided.

        Although the Court is sympathetic to Plaintiff's general concern about the COVID-19 virus, he has failed to allege facts showing that Defendants' handling of the COVID-19 crisis violated his Eighth Amendment rights.  Accordingly, the Court will dismiss his Eighth Amendment claims.

VIII.   **Fifth and Fourteenth Amendment Due Process**

        Plaintiff alleges that Defendants have deprived him of due process by virtue of their response to the COVID-19 threat.  The elements of a procedural due process claim are (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process. *Women's Med. Pro. Corp. v. Baird*, 438

---

[7] Notwithstanding the Court's ability to take judicial notice of these facts under Rule 201 of the Federal Rules of Evidence, the information in this paragraph plays no role in the Court's decision.  Instead, this information merely provides context and additional information to a prisoner who is incarcerated amidst an ongoing deadly pandemic.   *C.f. United States v. Mathews*, No. 20-1635, slip op. at 2 n.3 (6th Cir. Mar. 8, 2021), https://www.opn.ca6.uscourts.gov/opinions.pdf/21a0119n-06.pdf.

F.3d 595, 611 (6th Cir. 2006).  "Without a protected liberty or property interest, there can be no federal procedural due process claim."  *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)).

Plaintiff does not clearly identify the liberty interest at issue in his complaint. Within the complaint, he protests against the MDOC's requirement that he either be tested for COVID-19 or that he quarantine in segregation for two weeks.  However, the crux of his complaint is focused only on Defendants' failure to completely eliminate the dangers of COVID-19 transmission inherent in the prison setting.  (*See e.g.*, Compl., ECF No. 1, PageID.52, 57, 58.) Reading the complaint with all due liberality, *Haines*, 404 U.S. at 520, the Court concludes that Plaintiff attempts to assert a violation of his substantive due process rights under the Fourteenth Amendment.

"Substantive due process prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty."  *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002) (internal quotation marks and citations omitted).  "'Substantive due process [] serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used.'"  *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)).  "Conduct shocks the conscience if it 'violates the "decencies of civilized conduct."'"  *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998) (quoting *Rochin v. California*, 342 U.S. 165, 172–73 (1952))).

A.      **Mandatory Testing**

Plaintiff arguably alleges that Defendants violated his substantive due process rights when they required either that he provide a sample for COVID-19 testing or that he quarantine in segregation for two weeks.

In the context of the State quelling an ongoing pandemic, "the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Jacobson v. Massachusetts*, 197 U.S. 11, 26 (1905).[8]  Restraints may be placed on individuals, particularly in pursuit of the "common good."  *Id.*  The Supreme Court "has distinctly recognized the authority of a state to enact quarantine laws and 'health laws of every description.'"  *Id.* at 25.  A state's police powers must include the authority to issue "reasonable regulations" that "will protect the public health and public safety."  *Id.* (citations omitted).  A plaintiff cannot succeed in invalidating such a regulation absent a showing of "reasonable certainty" that the regulation would result in a serious impairment of his health or "probably cause his death."  *See id.* at 39.

To the extent Plaintiff claims that Defendants violated his substantive due process rights by inducing him to participate in COVID-19 testing, his claim fails.  The State's effort to test all prisoners appears entirely reasonable and calculated to identify COVID-19 infections, to isolate those infected individuals, and to quarantine those who have been exposed to infected

---

[8] In *Jacobson*, the Supreme Court decided whether, under state law, vaccinations could be compelled during an outbreak of a transmissible disease.  Although the Supreme Court decided *Jacobson* more than a century ago, courts have looked to it for guidance in the present pandemic.  *See, e.g., S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (mem.) (Roberts, C.J., concurring) (quoting *Jacobsen* that the Tenth Amendment vests State officials with powers to protect "'the safety and the health of the people'"); *Kentucky v. Beshear*, 981 F.3d 505 (6th Cir. 2020) (determining that, because the Plaintiffs brought a Free Exercise challenge to a law of general applicability, the Sixth Circuit need not extend its analysis under *Jacobson*); *Page v. Cuomo*, 478 F. Supp. 3d 355, 366 (N.D.N.Y. 2020) ("As relevant here, courts across the country have nearly uniformly relied on *Jacobson*'s framework to analyze emergency public health measures put in place to curb the spread of coronavirus.") (citing cases).

individuals.  Plaintiff has not alleged that he faces any increased risk of death or risk to his own health posed by the COVID-19 testing.  Consequently, Plaintiff fails to state a substantive due process claim related to the COVID-19 testing.

### B.      Threat of COVID-19 Transmission

Plaintiff further alleges a substantive due process claim related to Defendants' failure to completely eliminate the dangers of COVID-19 transmission inherent in the prison setting.  "Where a particular [a]mendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that [a]mendment, not the more generalized notion of "substantive due process," must be the guide for analyzing such a claim.'" *Albright*, 510 U.S. at 266 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (holding that the Fourth Amendment, not substantive due process, provides the standard for analyzing claims involving unreasonable search or seizure of free citizens, and the Eighth Amendment provides the standard for such searches of prisoners)).  If such an amendment exists, the substantive due process claim is properly dismissed.  *Heike v. Guevara*, 519 F. App'x 911, 923 (6th Cir. 2013).  In this case, the Eighth Amendment provides an explicit source of constitutional protection to Plaintiff concerning Defendants' alleged failures to protect them.  *See Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008) (because the Eighth Amendment supplies the explicit textual source of constitutional protection for claims governing a prisoner's health and safety, the plaintiff's substantive due process claim was subject to dismissal).  As a consequence, Plaintiff's substantive due process claim must be dismissed.

### IX.      Criminal Provisions

Plaintiff cites portions of the federal criminal code, 18 U.S.C. §§ 2, 134, 371, and 1341, as a basis for relief.  As a private citizen, Plaintiff may not enforce these statutes.  *See Abner v. Gen. Motors*, 103 F. App'x 563, 566 (6th Cir. 2004) (finding that a private citizen cannot initiate

a federal criminal prosecution under 18 U.S.C. § 241); *Cok v. Cosentino*, 876 F.2d 1, 2 (1st Cir. 1989) (per curiam) ("Only the United States as prosecutor can bring a complaint under 18 U.S.C. §§ 241–242.").  Plaintiff lacks "a judicially cognizable interest in the prosecution or nonprosecution" of another.  *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).  Furthermore, the foregoing statutes do not provide for a private right of action.  *See United States v. Oguaju*, 76 F. App'x 579, 581 (6th Cir. 2003) (finding that "the district court properly dismissed [the plaintiff's] claim pursuant to 18 U.S.C. §§ 241 or 242 because [the plaintiff] has no private right of action under either of these criminal statutes").  Thus, any claims asserted under the foregoing statutes will be dismissed.

X.    **Respondeat Superior**

To the extent that Plaintiff alleges that various Defendants merely issued DOMs but did not ensure their adequate enforcement, Plaintiff fails to state a § 1983 claim for an additional reason.  Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability.  *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).  A claimed constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Plaintiff

has failed to allege that Defendants engaged in any active unconstitutional behavior.  Accordingly, he fails to state a claim against them.

XI.  **State Law Claims**

Claims under § 1983 can only be brought for "deprivations of rights secured by the Constitution and laws of the United States."  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982).  Section 1983 does not provide redress for a violation of a state law.  *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994).  Plaintiff's assertion that Defendants violated state law therefore fails to state a claim under § 1983.  Moreover, to the extent that Plaintiff seeks to invoke this Court's supplemental jurisdiction over a state-law claim, the Court declines to exercise jurisdiction.  In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues."  *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.  *Id.*  Dismissal, however, remains "purely discretionary."  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).  Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction.  Accordingly, Plaintiff's state-law claim will be dismissed without prejudice.

XII.  **Pending Motions**

At the time Plaintiff filed his complaint in the United States District Court for the Eastern District of Michigan, he also filed three motions requesting leave to exceed the page limit,

31

a stay, and disqualification of the entire United States District Court for the Western District of Michigan.  (ECF Nos. 4–6.)

### A.      Exceed Page Limits

In the first motion, Plaintiff requests an order granting him leave to exceed the page limit described in E.D. Mich. LCivR 7.1(d)(3)(A)–(B), "based upon extraordinary an[d] necessary fact-based reasons."  (ECF No. 4, PageID.165.)  Presumably, Plaintiff intends to seek leave to file his 142-page complaint with attachments.  Alternatively, he may refer to the length of his motions to stay and for disqualification, when attachments are counted.[9]  The local rule to which Plaintiff refers, however, is inapplicable to the length of a complaint or attachments; the rule limits only the length of briefs.  The same is true of this Court's local rules governing the length of briefs.  *See* W.D. Mich. LCivR 7.2(b), 7.3(b).  Because the cited rule is inapplicable to his filings, Plaintiff's motion is unnecessary.  Moreover, because the Court has reviewed the entirety of Plaintiff's complaint and motions, his request to file excess pages is moot.  Therefore, the Court will deny Plaintiff's motion to exceed page limits.

### B.      Stay of Transfer

Plaintiff has also filed a motion to stay the proceedings.  (ECF No. 5.)  Plaintiff's motion, originally filed in the United States District Court for the Eastern District of Michigan with the complaint, apparently aimed at preventing the inevitable transfer of his case from that court to the United States District Court for the Western District of Michigan.  In light of that court's order transferring the action to the Western District, this Court will deny Plaintiff's motion as moot.

---

[9] Plaintiff's motion to stay is 5 pages long, but has 49 pages of attachments.  Plaintiff's motion seeking disqualification is 10 pages long, with 2 pages of attachments.  Neither motion includes a brief.

C.       **Disqualification**

Plaintiff further seeks to disqualify the entire United States District Court for the Western District of Michigan from presiding over his case.  (ECF No. 6.)  In support of his motion, Plaintiff alleges that on three previous occasions, the Clerk of the Court randomly assigned Plaintiff the same District Judge-Magistrate Judge pairing, and Plaintiff's complaint was dismissed on each occasion.  At this juncture, because the action has now been transferred to the Western District of Michigan and specifically to the undersigned, the Court will construe the motion as one seeking disqualification of the undersigned.

Under 28 U.S.C. § 455(a), "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  The provision requires a judge to *sua sponte* recuse himself if he knows of facts that would undermine the appearance of impartiality.  *Youn v. Track, Inc.*, 324 F.3d 409, 422–23 (6th Cir. 2003); *Liteky v. United States*, 510 U.S. 540, 547–48 (1994).  In addition, 28 U.S.C. § 144 requires that "[w]henever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."  An affidavit filed under § 144 must "allege[ ] facts which a reasonable person would believe would indicate a judge has a personal bias against the moving party."  *Gen. Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1043 (6th Cir. 1990).  The alleged bias must "stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case."  *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966).  Extrajudicial conduct encompasses only "personal bias as distinguished from a judicial one, arising out of the judge's background and association and not from the judge's view of the law."  *Youn*, 324 F.3d at 423

(internal quotation marks omitted).  "Personal" bias is prejudice that emanates from some source other than participation in the proceedings or prior contact with related cases.  *Id.* (citing *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1251–52 (6th Cir. 1989)); *Demjanjuk v. Petrovsky*, 776 F.2d 571, 577 (6th Cir. 1985)).

Plaintiff implies that bias exists solely because other judges of this district have ruled against him in prior cases.  His implications, which fall short even of conclusory allegations, appear to rest exclusively on his dissatisfaction with the prior rulings, and they therefore do not mandate recusal.  *See Amadasu v. Mercy Franciscan Hosp.*, 515 F.3d 528, 530 (6th Cir. 2008); *Rodman v. Dalton*, No. 88-3303, 1989 WL 16960 (6th Cir. 1989) (citing *Cleveland v. Krupansky*, 619 F.2d 576, 578 (6th Cir. 1980)).  This is particularly true where, as here, Plaintiff has not alleged any prior interaction with the undersigned.  Because the Court has no bias against Plaintiff, disqualification is unwarranted, and the Court will deny Plaintiff's motion to disqualify.

### Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. § 1915A(b) and 42 U.S.C. § 1997e(c).  The Court will also deny Plaintiff's pending motions.  Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g).  Should Plaintiff appeal this decision, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

An order and judgment consistent with this opinion will be entered.


Dated:    March 15, 2021              /s/ Robert J. Jonker
                                      ROBERT J. JONKER
                                      CHIEF UNITED STATES DISTRICT JUDGE

34